DINGLE v. MITCHELL.

1. If copy-deeds are received in evidence without objection, they become competent testimony in the cause, and proof of loss of the originals is dispensed with.
2. There being evidence of possession for more than twenty years by those through whom the plaintiff claims title to the land in dispute, and also evidence of plaintiff's title from a source under whom defendant also claimed, the judge correctly refused defendant's motion for non-suit.

3. Under the acts of assembly legalizing the marriage of slaves, and declaring their issue legitimate, property of such former slaves passed, as in other cases, according to the statute of distributions; and a wife and child are preferred to sisters and their children.

4. Such acts affected the marriage of a free person of color with a slave, and their issue, to the same extent as where both parties were slaves.

5. There was no error in charging the jury that if a free man of color purchased his slave-wife with a purpose of making her free, and she afterwards enjoyed freedom for twenty years, the jury might presume that the husband had taken her out of this State, and thereby accomplished her freedom.

6. The charge in this case held not to be a charge upon the facts within the inhibition of the State constitution.

Before PRESSLEY, J., Charleston, November, 1882.

This was an action by G. W. Dingle against David Mitchell, for the recovery of a house and lot in the city of Charleston. The opinion states the case, but as the case turned upon the alleged slavery of Mary Ann Conerway, the testimony upon this point, as found in the brief, is added. George H. Walter, witness for plaintiff, testified that "Mary Ann was free, I know; * * * knew her from childhood; always thought her free; does not know that her husband bought her." H. T. Graddick, for plaintiff, testified: "Have known her since the war; * * * do not know whether Mary Ann Conerway was a slave or not; always took her to be free." Diana Murley, for defendant, testified that she was a sister-in-law of Scipio Stewart; "knew Mary Ann Conerway long before she was married; Mary Ann was a slave; she belonged to Mrs. Dibble; Scipio Stewart bought her."

The testimony also showed that Mary Ann lived upon the premises with her husband, Scipio, and after his death, continuously to her death, except possibly during the period of the war. There was no suggestion in the evidence, that her husband, Scipio, had taken her out of this State at any time.

The judge's charge was as follows:

If this property was Mrs. Conerway's, the plaintiff has a good title; if it was not hers, the plaintiff has not a good title.

The first title we have is in 1847, when it was bought by Scipio Stewart. There is no proof of a grant behind him, and without it that title cannot stand. But twenty years' possession is equivalent to a grant. I charge you that although that title is in the form of a trust deed, there being no trusts declared at all, except to Scipio Stewart, it was the same as a legal title to him out and out. It is a mistake to suppose that the trustee had any title at all. The statute of uses executed the use and vested the legal title in him; so that the legal title to that property was in Scipio Stewart, the very day the deed was delivered to Wilmot Walter.

His heirs-at-law are his widow and his son, William and Mary Ann Stewart, unless she was a slave. If she was a slave, she could not inherit. If you believe that she was a slave, her son William cannot inherit either. Neither of them could inherit, and it is perfectly clear that none of these parties could inherit, the proof being that all of his brothers and sisters were slaves; so that who were his legitimate heirs does not appear before the court. Their mother, Nancy, was a slave, but she outlived William, the son of Scipio, so that there can be no claim of minorities in the question at all, Nancy, his sister, being a slave alive until after William died. They were not the heirs even if they had been free, so long as the mother lived. If Mary Ann Stewart was a slave, neither she, nor her son William, nor any of these parties here could inherit, and the property belonged to any of his next of kin who were free, unless Mary Ann Stewart acquired title by possession. If she was free at the time the property descended to her she would receive one-third, and her son William two-thirds, and when her son died that property went to her. It would not go over to any of his kin, his mother living.

Was she free? According to the law of South Carolina, if you consider it proved that she was a slave, and that she was bought by her husband, then she could not be set free in this State. But if her husband bought her for the purpose of making her free, and if she enjoyed freedom for twenty years, then the law presumes that he did such acts as legitimately made her free. That is the presumption of the law. If you believe that Scipio

Stewart bought his wife with the intention of her being free, and she enjoyed freedom for twenty years, the law presumes that he did all that would legitimately make her free, and he could have done so by taking her into another State. The law presumes that he did all those necessary acts after twenty years' enjoyment of freedom. If, therefore, you believe that he bought her with the intention of making her free, and that he carried out his purpose to make her free, then she could inherit the property. If that was not his purpose, and his purpose was to hold her as a slave, then she was still a slave, and could not have inherited from him at the time of his death.

After his death, we find upon record a deed, dated 1856, under which she claims that she holds that property in her own right. That deed did not give her any right at all, but it being put upon record, it was notice to all the heirs of Scipio Stewart that she was in possession of that property, holding it adversely. That is a deed declaring that she is in possession of the property holding it as her own, and in ten years from that time, under that deed, by her possession she would have lawful title against all the heirs of Scipio Stewart, unless minorities be proved. No minorities are proved in this case, because there is no proof here who are his heirs. The parties here before you are not his heirs under the law. If the children of slaves could inherit from him, then his son was his heir. I cannot see upon what ground they can claim to be heirs, when they claim that the son, who was a slave, could not inherit, when they were slaves themselves.

I charge you then that if there was any inheritance at all, that inheritance was in the son, and when he died the mother became sole heir and came into possession of all the property, and that the putting of that deed on record, in which she claimed title in herself to the whole property, was from that time notice of adverse possession to all the world. Under that notice the property would be hers in ten years, or in 1866, and a grant would be presumed in twenty years, or 1876. In any aspect of the case, the title as it now appears before the court seems to be a perfectly clear title in Mary Ann Stewart. Either as a free person she and her son inherited from Scipio Stewart, or, that not being the case, she has title by possession against his legiti-

mate heirs whoever they may be. But the defendant alleges that there was a disability which would prevent the statute from running. He must prove the disability. He must prove that Stewart had heirs and that they were under disability all the time that Mary Ann was in possession.

From the facts now before me it appears that at the time of her death she had a perfect title to this property. As to the claim that she was not in possession all the time, she alleges in the deed that she was in possession, and all that knew her say that was where she lived up to the time of her death. There is no proof that that possession was ever broken. It seems to me that the plaintiff has a clear title to this property; that the defendant is not in lawful and peaceable possession as alleged, and that he is a mere trespasser, and that those who claim with him stood by and saw Mary Ann Stewart in possession of it and never interfered with her claim to the property until she disposed of it in a way that they did not approve of. If it was hers, she had the right to dispose of it as she saw fit. We have no right to interfere with that. The proof is that the defendant took possession about the beginning of this year; there is no proof as to what the premises are worth as rent during that time; you will have to determine that for yourselves.

*Messrs. Lee & Bowen,* for appellant.

*Messrs. Lord & Inglesby,* contra.

November 22d, 1883. The opinion of the court was delivered by

MR. JUSTICE McGOWAN.—This was an action for a lot of land on the west side of St. Phillips street, in the city of Charleston, known as No. 125. The question was purely one of title.

The plaintiff put in evidence: 1. A copy of deed of the premises from James K. Robinson to E. Wilmot Walter in trust for Scipio Stewart, his heirs and assigns forever, bearing date April 26th, 1847. 2. Copy of a deed of marriage settlement between Mary A. Stewart, widow of Scipio, with her second husband, Peter Conerway, which, after reciting that

George H. Walter, as trustee, was seized in fee of the lot, provided that he should still continue to hold the same "for the said Mary Ann, free from the control of any husband she may have, for the term of her natural life, and after her death then to her son William or his children, should he or any child of his be then living. But should he die before the said Mary Ann, then in trust for such uses and purposes as the said Mary Ann may by will or deed appoint." 3. Will of Mary Ann Conerway, December, 1881, giving her executors power to sell the lot—her son William having died before, in 1867, unmarried and without issue. 4. Deed of the executors of the will of Mary Ann to Dingle, as purchaser, April 7th, 1882.

Scipio Stewart was a free man of color, and lived with his wife, Mary Ann, who was also generally supposed to be a free person of color; but there was testimony tending to show that Mary Ann was originally a slave, and that many years ago (the precise time does not appear) she was purchased by her husband, Scipio. It is certain that as husband and wife they went into possession of the lot soon after it was purchased from Robinson, in 1847, and lived there as free persons of color until Scipio died intestate, in 1852, leaving as his widow the said Mary Ann, and her son William, who claimed the lot and occupied it until the death of Mary Ann, in 1881, William, the son, having previously died without wife or children. Mary Ann left a will, authorizing her executors to sell the lot, which they did, and at their sale the plaintiff, G. W. Dingle, became the purchaser and now claims the same through the said Mary Ann.

It seems that Scipio Stewart had sisters, who were slaves. The defendant, Mitchell, is one of the children of the sister Nancy, and he and his mother, now deceased, were both born slaves. The said Mitchell, after the death of Mary Ann, having in some way or other obtained possession of the said lot, now claims it as one of the heirs-at-law of Scipio Stewart, who died thirty years ago.

The case came on for trial before Judge Pressley, who refused a motion for non-suit, and, under his charge, the jury found for the plaintiff, Dingle. The defendant appeals to the court upon the following exceptions:

1. "Because his Honor erred in admitting in evidence copies of the following deeds without proof of the loss of the originals, viz. : A deed from James K. Robinson to E. Wilmot Walter in trust for Scipio Stewart.' A deed from Mary Ann Stewart and Peter Conerway to George H. Walter.

2. "Because his Honor erred in not granting a non-suit on the ground that the plaintiff had not traced his title back to a grant from the State nor to a common source, as asked for by the defendant.

3. "Because his Honor erred in ruling that Mary Ann Stewart had been in possession of the premises for twenty years when there was no evidence to prove the same.

4. "Because Mary Ann Stewart, if she had title at all, acquired it as heir of Scipio Stewart, and there was no proof that she was ever married to the said Scipio Stewart, and his Honor erred in not so ruling.

5. "Because his Honor erred in refusing to charge the jury that if they believed Scipio Stewart was a free person of color and Mary Ann a slave, they could not find a verdict for the plaintiff, as a slave could not own property in his own right, nor could he hold adverse possession against the world.

6. "Because his Honor erred in refusing to charge the jury that if they believed Scipio Stewart was a free person of color and Mary Ann a slave, William Stewart, their child, was illegitimate, and took nothing at his father's death.

7. "Because his Honor erred in refusing to charge the jury that the legislature of this State had made no provision for the issue of a free person of color and a slave; but that the legislature has made provision for the issue of slaves, whereby they may inherit their ancestors' property.

8. "Because the plaintiff's case was fatally defective, in that Scipio Stewart was a free person of color; Mary Ann, who claimed to be his wife, a slave, and neither Mary Ann nor her son, William, could take property under the statute of distributions of this State. That the sisters and brothers of Scipio Stewart, at his death, were his next of kin and lawful heirs, and if at the time they were laboring under a disability, and died laboring under said disability, leaving children, from whom the disability

was afterwards removed, they (the children of such sister or brother) became the legal heirs of such intestate, deceased, and his Honor erred in not so ruling.

9. "Because his Honor erred in charging the jury on questions of fact and giving them his opinion thereof.

10. "Because his Honor erred in charging the jury as follows : ' His (Scipio Stewart's) heirs-at-law are his widow and his son, William and Mary Ann Stewart, unless she was a slave. If she was a slave she could not inherit. If- you believe that she was a slave, her son William cannot inherit either. Neither of them could inherit, and it is perfectly clear that none of these parties could inherit, the proof being that all of his brothers were slaves.' "

Exceptions 1 and 2 complain that the judge erred in not granting a non-suit; first, because there being no evidence of the loss of the originals, it was error to admit in evidence the deed from Robinson to Walter in trust for Scipio Stewart, and the marriage settlement of Mary Ann Stewart and Peter Conerway; and second, for the reason that the plaintiff did not prove a perfect title or trace it back to a common source, from which the defendant also claimed. The objection as to the proof of the deeds does not touch the merits of the case, for we suppose there can be no doubt, that the deeds were executed as they appeared recorded. The presiding judge says " the deeds were put in evidence without objection at the time." The time to object was when they were offered and taken down by the judge as in evidence. If objection had been then made, we must assume that the proof of loss would have been made. This court has held that " what proof of loss of a written paper is sufficient to permit secondary evidence of its contents is, to a large extent, a question of fact to be decided by the judge, and his discretion will not be disturbed except in very rare cases." *Oliver* v. *Sale,* 17 *S. C.* 587.

As to the proof of title in Mary Ann, under whom the plaintiff claimed, the rule, as announced in the case of *Young* v. *Watson,* 1 *McM.* 449, is that " a plaintiff can only make out a perfect title by producing a grant or by proving such a possession as will give

title in himself or in some one from whom he derives title." The judge held that " she (Mary Ann) must trace title to a grant, but that twenty years' adverse possession, where there are no disabilities, is equivalent to a grant from the State, and the presumption is that the grant was at the beginning of her possession." Whether there had been such possession was a fact for the jury, and we cannot, therefore, say that the judge erred in refusing the nonsuit. We might add that the plaintiff did trace title to a common source. In our view of the case, certainly both Mary Ann and the defendant claimed by descent from the same person, Scipio Stewart, who undoubtedly had the legal title under the operation of the statute of uses.

Exceptions 4, 5, 6, 7 and 8, in different forms, allege error on the part of the judge in refusing to charge as matter of law that plaintiff's title was fatally defective for the reason that Mary Ann, although purchased by her husband and living with him as his wife, continued to be, technically, a slave, and subject to all the disabilities of slavery, one of which was an inability to make a legal contract of marriage, and, as a consequence, to be either an heir herself or the mother of an heir. As the defendant suggests, suppose we assume this to be good law, the result would necessarily be that there could be no inheritance at all or title by the statute in this case, but the land would be forfeited to the State for the want of an owner. For it is undoubtedly true that the sisters of Scipio and their children, including the defendant, were also slaves and under the same disabilities.

It is replied, however, that there was a general emancipation of all slaves in 1865, and after that the legislature of the State passed certain laws legalizing the marriage of persons who were in bondage at the time they were contracted, and declaring that the issue of such marriage might inherit from their parents and from each other according to the statute of distributions (see *Davenport* v. *Caldwell*, 10 *S. C.* 332). Taking then the statute of distributions as fixing the canons of descent applicable to these people, it is plain that the widow and child should inherit from Scipio in preference to his sisters or their children.

But it is earnestly insisted that the aforesaid enabling acts, when properly construed, refer to and embrace only marriages entered

into by parties who were at the time both slaves, and were not intended to include a marriage contracted between a female slave and a man of color who was at the time free, leaving such marriage, as in this case, illegal, and the issue thereof illegitimate. We do not so understand the acts referred to. The man Scipio, being a free man, was under no disability in respect to marriage. He had the right to make a legal contract of marriage and to have legitimate children, but upon the assumption that Mary Ann was still a slave, she was under a disability which touched Scipio's marriage with her, and made his child, William, illegitimate. But this was the very result the enabling acts were intended to prevent. No such distinction as that contended for can be found in the acts themselves, and such a narrow construction would violate their whole spirit and intent.

On the contrary, the terms of these acts show that they were intended to be as general as the mischief they remedied, and to apply as well to a marriage of a female slave with a free person of color as to cases where both parties were slaves. " Cohabitation, with reputation or recognition of the parties, shall be evidence of marriage in cases criminal and civil." * * * " Every colored child heretofore born is declared to be the legitimate child of his mother and also of his colored father if he is acknowledged by such a father," &c. 13 *Stat.* 291. As was said in the case of *Davenport* v. *Caldwell, supra:* " This section is unquestionably retrospective, and applies to the dead as well as the living." In this view the enabling acts applied to the marriage of Mary Ann with Scipio even if she was a slave at the time, and made William the legitimate child of Scipio and capable of inheriting from him. At the death of Scipio, Mary Ann was entitled to one-third, and William, his son, to two-thirds of the lot. Upon the death of William, without wife or children, his mother inherited the whole interest, and the same passed under her will to the plaintiff.

But did Mary Ann necessarily remain a slave until the general emancipation of 1865, and under disability to take and hold property until the passage of the enabling act in 1872? *Gen. Stat.,* § 2031. The judge charged the jury that if they believed " that Scipio Stewart bought his wife with the intention of her

being free, and she enjoyed freedom for twenty years, the law presumes that he did all that would, legitimately, make her free, and he could have done so by taking her into another State." Was this error? It is true that by the laws of force in this State in 1846 no slave could be emancipated in the State except by an act of the legislature. But it was held in the case of *Willis* v. *Jolliffe,* 11 *Rich. Eq.* 447, as late as 1860, " That there is nothing in the policy of the law of this State against a master taking his slaves to a free State and there emancipating them himself." It was not impossible, and the jury were told that if they believed that Scipio bought his wife with the intention of making her free, and she enjoyed freedom for twenty years, the law presumes that he did all that was necessary to make her free, and the presumption is that the grant was before her possession. We cannot say that this was error.

It was surely not error to leave it to the jury to decide whether the husband purchased his wife with the intention of making her a free woman. The court could not assume conclusively that he did the unnatural thing of buying his wife in order to keep her as his own property. It seems that at the very least, from 1846 to 1852, when Scipio died, Mary Ann lived with him as his wife, and thenceforward until she died, in 1881, being over thirty years, always treated and considered as a free person of color, and certainly after 1852 was in the quiet and exclusive possession of the premises in question. "After a lapse of twenty-eight years an executor's assent to a legacy of freedom to a slave was presumed." *Bowers* v. *Newman,* 2 *McM.* 486. " When a negro slave has been at large and acting as a freeman for more than twenty years a deed of manumission under the act of 1800 was presumed." " The court will presume whatever is necessary to give efficacy to long possession." *Willingham* v. *Chick,* 14 *S. C.* 103.

Considered with reference to the context, in which it was said, and without regard to the enabling act stated, we do not think the judge transcended the limit imposed by the constitution when he charged the jury as follows: " His (Scipio) heirs-at-law are his widow and his son William and Mary Ann Stewart, unless she was a slave. If she was a slave she could not inherit. If you believe she was a slave, her son William cannot inherit either.

Neither of them could inherit, and it is perfectly clear that none of these parties could inherit, the proof being that all of his brothers and sisters were slaves."

The judgment of this court is that the judgment of the Circuit Court be affirmed.